May it please the Court, Bruce Thomas and Stephen Griggs for Appellants James and Jimmy Anderton. I don't think I have to apologize for bringing you a boring case this morning, if nothing else. It's a case that has, I think, very compelling facts and devastating impact on my client. What I would like to discuss this morning is whether the trial court failed to apply the appropriate standard of review in dismissing under 12b-6, by one, indulging in inferences and assumptions in favor of the defendants rather than in favor of the plaintiffs, two, whether the court gave far too narrow of a reading to our pleading, and conversely, whether the court read the defendant's legal authority far too broadly. Finally, I'd like to discuss whether the district court erred in failing to invite the Andertons to amend before dismissing the 1983 Enrico claims because the dismissal based on substantive due process, Fourth Amendment, and Enrico were based on grounds raised by the court sua sponte. I don't want to belabor the facts, but I would like to emphasize three. On February 2, 2010, the Andertons pleaded guilty to federal conspiracy charges to violate the Lacey Act based upon conduct that had occurred approximately five years earlier. They continued to operate for another five months under the permit that they had received a renewal on in 2009. Nobody at that point was claiming that the Andertons were not qualified persons entitled to continue operating under their permit. Secondly, our pleading specifically pleads on page 10 that the deer the Andertons had on the ranch in 2010 were legally obtained. Therefore, there is nothing in the pleadings to support the notion that I think is floating around that the deer that were imported after the border was closed in 2005 are necessarily the same deer we're talking about in 2010. That just hasn't been established. That's contrary to our pleading. And third, the Andertons were misled about administrative review. When June 30th came and they didn't get their renewal, the department didn't give them a reason, but it did give them a letter, and the letter said, you're entitled to administrative review. And the Andertons said, that's great. We'll take it. We want our administrative review. We think we've been wrongfully denied our permit. Well, that apparently was the wrong response, because the department clearly had no intention of providing them with administrative review and never did. It's something that perhaps sounds good to put in a letter. It sounds much better than sending them a letter that says, we're going to deny your renewal. We're not going to give you a reason why. We're not going to give you an opportunity for review. We're going to do it again in 2011 and 2012. And by the way, we're going to summarily destroy the deer and destroy your business without ever giving you notice and an opportunity to be heard. Now, that certainly wouldn't have been a nice letter, but it would have had the virtue of being honest. Instead, the Andertons were misled while they're asking, when are we going to get our administrative review? Why are you denying our application for renewal? They get their answer in the form of armed agents coming up their driveway that locked down the ranch and began destroying all the deer. Didn't the state law allow for judicial review of the permit denial in state court in Travis County? And why wasn't, it seems like failure to pursue that creates an exhaustion problem on the due process, although the state didn't argue it, so maybe it's not an issue before us. But why didn't they go to court in Austin? I believe they did file a state court lawsuit. It was subsequently dismissed or non-suited. I don't know the details of that. But what we have led is that the Andertons were relying upon their promised administrative review before they attempted to further exhaust remedies in state court, and they never got a final order on the promised administrative review. So we argue that they never had to proceed further. But the state's conduct put the Andertons in an untenable catch-22. They're wrongfully denied their permit, then they're summarily punished for not having a permit. All the time, they're being told they're going to get administrative review in the department first, and never being given an explanation for why this is going on. It's just a fundamentally unfair procedure, substantively and procedurally, and I think it fits this court's words in Covington that it's stunning evidence of arbitrariness and it stunned the Texas legislature into action in 2013 to revamp the statute to impose upon the department to ensure that they were providing the due process that they had failed to provide to the Andertons. And I think that's at least some recognition by the Texas legislature that these folks have a property interest that the state of Texas wants to protect in their permits and in the deer they acquire in conducting their business. Of course, our contention is that the Andertons are entitled to have the department's account for their, department officials' account for their conduct under Section 1983. The district court did not give deference to our pleading that the Andertons were qualified persons entitled to a permit. That undergirds much of the argument, much of the district court's decision. The reason is because of the conspiracy conviction that was attached to the defendant's motion to dismiss. But that doesn't get the defendants there as a matter of law in establishing that the Andertons were not qualified persons entitled to renewal of their permit for several reasons. First, it assumes that the department actually made a determination that the Andertons were not qualified persons, and it did so for the reason of the federal conviction. And that's just an assumption. The department's never admitted or stated why they deny the Andertons their renewal. In fact, it has repeatedly stated, we don't have to tell you. That is their position. It's always been their position. But in deciding whether the state permit statute, the old one, gives rise to a property interest, isn't the issue just whether the state has discretion? I mean, it doesn't really turn on how the state exercises. It's just, is this a mandatory permit, which gives rise to a property interest, or is there discretion here, which probably means there would be no property interest? So why does it matter what actually happened in this case? Well, because I think it does make a difference in determining whether there's discretion on what basis the department acted upon. To jump ahead a little bit, I think one of the reasons here that these documents attached to the, these conviction documents attached to the motion dismissed don't get them there is because it assumes that all Lysiak convictions are treated the same. And that's not the case. It's not the case, definitely not the case under present law that clarifies that the department has to consider several factors. And I, and the prior law always said may. So it says a permit may be denied if you have a Lysiak conviction in your background. Conversely, it may not be. So there still must be some criteria that a department is using to separate those permits that denies when a Lysiak conviction is in the background and those that it does not when a Lysiak conviction is in the background. It can't just arbitrarily say in months with an R, we're going to deny the permit. It still must be operating under some rule as to when a Lysiak conviction gives rise to a, to a denial of permit and a determination that you are a disqualified person. However, under present law, the legislature specifically says you're to consider mitigating circumstances, the actual acts involved, how long it has been, presumably those raw factors that the department was actually considering prior to 2013 and making its determination when a Lysiak conviction was and was not applicable to being a disqualified person. And when we look at the information here under which the Annertons were pleaded guilty, there are nine importations back in 2004, 2005. It's, it's indisputable that Texas didn't close the border to importation of deer into June 21, 2005. Only one of those importations was after June 21, 2005. So perhaps there is more going on here that meets the eye that, that from the, from a simple review of the information. That would have fallen with . . . Can you address the Fourth Amendment issue? And I know the state now is arguing open fields in addition to the administrative inspection ground that the district court relied on. And looking at your complaint, it doesn't allege a lot about how these, the killings, you know, where they actually happened and the details. In your brief, though, it's, I'm a little confused. Because first you say there's some indication the residents were actually kept in their house, confined in their house. But then you're saying they had to witness these terrible killings right in front of their eyes. So, I mean, what exactly happened? Well, I mean, that's true. Our pleading doesn't go into intimate detail of the facts. My understanding of what we can prove, or we can plead and prove, if we get an opportunity on remand, is . . . And so, the, what was the purpose that the Andersons had in breeding these deer? Weren't they selling them to people? I assume, I used to hunt deer. I kind of stopped the four-legged stuff, not for ethics, but just, you know, I like bird hunting better now. But I assume that they would sell them to other ranches, other places where people would hunt them. I presume that would be the thing. So, I mean, the Anderson, I'm trying to figure this shock, the conscious thing. I mean, they were breeding them so they could be sold, so they could be shot. And somehow or other, because they're shot, it shocks the conscience. I mean, they were breeding them to be killed, to sell, make money off them, and have them killed, and now, because they get killed, it shocks their conscience. Well, I don't know that that is necessarily the fate of all of them. They're breeding them as breeders. I mean, just like ranchers breed cows, some of them are sent to market, some are bred, some are sold to other breeders to be bred. So I don't know the fate of all the potential deer. But if they're breeding them for food, they're going to be killed anyway. Well, they're, yeah, but being killed humanely and being killed in the manner that they were, I think are two entirely different things. But what I would emphasize is the court, I believe, far too narrowly read our petition on that issue. The substantive due process claim, the trial court focused just on the last sentence of paragraph 27, where we make the statement that killing them in the manner that the state did shocks the conscience. But we're complaining about due process all the way through. In the preceding paragraph, in paragraph 26, we recap everything we're complaining about and complain about the denial of the permit, the two raids, the destruction of their business, and say that all of that is a substantive and procedural denial of due process. So for the court to have just focused on that one statement, which was the coup de grace, we think that was a terrible way to go about it. That's not the entirety of our argument. That's reading our pleading too narrowly. To come back to your question, Judge Costa, the, my understanding of what we can show is that, and some of this is shown on the video that News 8 took, is that there was this invasion up the driveway. And they came to the house first. And that they were going to fan out. And exactly where the deer are in there, my understanding is there's multiple pins. Some are far away. Some are not. And that they were going to start shooting, you know. And if you want to stay out of harm's way, you need to stay in the house. At some point, people were brought in for burial detail. How long were the agents out there shooting the deer? My understanding is that the first time it was about three days. And I'm not sure on the second occasion how long they were there. But the deer are out, I mean, it's a ranch. They're out in the fields. Some are held in pins, you know, close in, depending upon exactly what they're doing with them. Are they breeding them right then? Are they having medical treatment? Are they, you know, scheduled to be used for, to be sold or whatever? So some of the operations are in the immediate environments of the house. Some are not. And exactly what was and what isn't. And how that plays into the shutdown of the entire ranch, why the agents are doing this, we haven't had an opportunity to address because it wasn't brought up below. But let me be sure to mention that this federal conviction just simply wasn't a Lacey Act conviction. Now, it was a conspiracy conviction. Now, is that a technical argument? Certainly it is. But when you're dealing with putting a person's livelihood out of business, close just isn't good enough. And these, on the basis of just the attachment, you cannot come to the conclusion that the Andertons are disqualified persons, just based on that as a matter of law. Thank you. All right, counsel. Mr. Murphy. May it please the court. Mike Murphy for the department. The district court correctly dismissed Anderton's claims for at least three reasons. First, non-renewal of the permit was not a procedural due process violation because the Andertons had no property rights to renewal. Second, seizure of the deer was not a procedural or substantive due process violation because the Andertons had no property rights to the deer. And third, seizure of the breeder deer on the Anderton's ranch was not a Fourth Amendment violation because the deer were taken in the open fields, and in any event, they were taken pursuant to a valid administrative inspection. How about going on to the property? How did, would you explain to me, not necessarily, per se, shooting of a deer, but going on to the property to shoot them? How does that happen? Is that a, is there an administrative order? Is there a warrant? You'll have to excuse me. I don't know enough about the particulars of the case here, but how did that come about? What was the procedural mechanism that was used to, you know, come on the property and let them know we're going to do this? Did they just show up one day, or how does that happen? Well, Judge Benavides, we're bound by the plaintiff's pleadings in this case because we're at a 12B6 stage, but the department was authorized under Texas Parks and Wildlife Code 43.358 to conduct warrantless unannounced inspections of any enclosure that held breeder deer, as well as inspecting the records held by the deer breeders. Is this an inspection? I mean, it seems to me going on that they knew what they were going to do, that the permit had expired, they, the Andertons hadn't gotten rid of these deer, so the state was going to do it itself. First of all, that doesn't seem to me like an inspection. Second of all, even if it is an inspection, a three-day inspection with no time limits that the statute provides, I mean, is there any case law you can cite that supports an administrative inspection of that duration? I don't think there's anything sort of on point with respect to this. This is a sort of unusual case, but I think an analogy may be helpful. I mean, if we think about an administrative, let's say that the Andertons were timber, had a license to cut and maybe raise timber on state land, and it turned out that, and it was a renewed license, and it turned out that the department had discovered that they were using perhaps equipment that had been infected or was possibly in an area that had been infected that might infect the forest. The department had the authority under state law to go on there and to inspect to make sure that the administrative rules were being complied with, and also to take action as necessary to ensure that those laws were complied with. For example, Texas law expressly provides authority for authorized personnel of the department to take, which includes kill wildlife, which includes white-tailed deer, for a variety of things, including disease diagnosis and prevention. In addition, by the time that- I know, but were these deer killed because they were diseased, or were they, were, they killed because these people didn't have a permit to have them, and therefore, does that, because they don't have a permit to have them, you're saying that you're authorized to go ahead, come onto the property and kill them? I think it's both. So you can't have them, we're going to kill them. I think it's both. One, the state clearly has authority under the administrative regulations to, and is actually required to, dispose of any deer that remain after the breeder permit expires. At the time that they came onto the ranch, the breeder deer permit had been, was expired. So they were, they had authority and an obligation to dispose of the deer there. One of the things that concerns me about that administrative code provision, it first says breeder deer may be disposed of by the breeder, and then it has four ways that the breeder can dispose of them. It then says breeder deer still in possession 30 days after termination of the license shall be disposed of, using the same operative word as in the preceding more limited division, disposed of at the discretion of the department. Seems to me it's a pretty good statutory interpretation on this regulation. Argument that you're limited to the same four ways of disposal, which is donate to another deer breeder, zoo, other things you probably appreciate better than I do. So where do you get the authority just to shoot them on the property? Well, I think there's a couple of things. First is, because the Andertons had no property interest in the deer, what the department did with the deer could not have possibly established a procedural due to the license violation, because having a property interest is sort of the first step. You're saying they have no standing, that maybe you didn't follow the regs, maybe these deer shouldn't have been shot, maybe they weren't shot according to oil, but these people are not people that are able to complain about it. That's right. I mean, the first question the court must decide is whether the Andertons had a property interest in the deer, and this goes to the sort of whether the deer were properly disposed of, and also their allegation that somehow the department didn't comply with their promise to provide an administrative review. This court has held in Brown versus Texas A&M, and I quote, the failure of a state agency to comply with this internal regulations is insufficient as a matter of law to establish a violation of due process. The question the court has to decide, and the question I think is positive of this due process claims, is the department, or I'm sorry, the Andertons had no property interest in the deer. The deer have always been, under Texas law, property of the state of Texas. It is illegal to possess deer. The only, an exception to that is a valid deer breeder permit, but the, excuse me, the deer breeder permit authorizes possession of deer during the term of the permit. It does not convey a property right. In fact, the statute that provides for deer breeding specifically says that all deer breeder and offspring, quote, remain under the full force of the laws of the state pertaining to deer. So there's, the Andertons had no legitimate claim of entitlement, either to a renewal of a permit, or to somehow keeping these deer, which were not their own. They were the public's property. You said earlier in response to my question about the administrative inspection that this is kind of a novel case. Did the individual defendants invoke qualified immunity below? Because I didn't see the district court really go through a qualified immunity analysis. I mean, he just looked at it. Was there a violation alleged? Yes, Judge Costa. Qualified immunity was raised, but the court didn't reach it. I think the court noted in a footnote that it had been raised, but it wasn't necessary to reach the qualified immunity question. But it was probably before the district court. It was before the district court, yes. An alternative basis to affirm. Absolutely. We didn't argue. It was argued. It was right. It was before the court. Right. It was presented to the district court. We didn't address it in our brief to this court, because the district court hadn't addressed it. And now in the Fourth Amendment, you're pushing this open field, which I see why. I think it might be the better fit, but isn't it a problem that that wasn't raised below and because of that, we don't really have, his allegations don't really focus on where the killing occurred. So how do we analyze the open fields when we don't know if they were killed right next to the house or 20 acres away? Well, I think there are two things. First, they don't allege in their pleading or their complaint below that these deer were killed. They were killed on the ranch is how they plead the complaint. They don't allege that they were killed within the curtilage of their home or. That they were forced to watch. I'm sorry? Or that they were forced to watch. Or they were forced to watch. Now, and also. If you buy a ticket to see a pornographic movie, you can't complain that it offended you. So, I mean, you've got to show that, you know, you're exposed to something that you had no, weren't, didn't think you were going to be exposed to. That's right. And I think it's important to clarify also what their Fourth Amendment claim is. They claim that the Fourth Amendment was violated by the seizure of the deer. They don't claim that they were, their Fourth Amendment rights were violated by somehow being detained. But being on the property is, the state officials being on the property is. I mean, the district court analyzed it two ways on the Fourth Amendment. One, it was being on the property a problem. And he says, no, because this administrative inspection. And then two, what about killing the deer? And I think that's where he gets into the plain view with the district. Because, I mean, they did at least say being on the property was a search. That's correct. I guess what I'm trying to say is that in their brief and at the argument here, they, the Endertons make much of being detained or under house arrest. But that is irrelevant to the constitutional analysis with respect to the seizure of the deer. Well, one thing about you not raising the open fields in the district court and this issue not really on this point, but has been raised on whether they had the right to amend. Is that it had been raised. And if in fact there were allegations they could make about the deer, some of them being perhaps within the curtilage, that would have been ripe to ask for leave to amend the complaint. And so it does seem to me difficult for us to use the open fields doctrine if under any possible factual, unless the deer had to be inside the house in order for the Fourth Amendment to apply, and I don't know if that would be a plausible interpretation of the pleading, absent some very limited view of the Fourth Amendment, it seems to me we don't have enough to go on for open fields. Well, I think that actually the plaintiff's brief to this court bolstered the open fields position because they alleged throughout their briefs that these deer were killed, you know, over the spread of their ranch, that these department officials had to drive around looking for them. They made no allegation that the department went into their home or went into some sort of business building. I did hear today that some of them may have been in a pen. Is that a new assertion? I don't believe they raised that in their complaint. But even if open fields is not a basis that this court wants to rule on, the department's entry onto the ranch and seizure of the deer was pursuant to a valid administrative search. They had statutes. They can last days? I don't know if you ever had the chance to answer my question about the three-day duration of it. That just seems far beyond anything I've seen in the case law. Well, this is also a rather unique circumstance where we have deer, which are wildlife, running around what they allege to be a 600-acre ranch. So it's not that they- It's not illegal for them to have deer. Ranchers have deer on their land. It's illegal for them to be breeding them, right, or keeping them in captivity, right? That's right. But the fact that there's deer on their ranch is not illegal. How do you get from, well, I saw a deer, therefore there was a violation, I had to shoot it, because you don't know whether this is a bred deer or a captive deer or a wild deer. This goes back to the Andertons' property interest. The Andertons simply have no property interest. If the Andertons were just general ranchers and the department came onto their ranch and killed all the deer they found on their ranch because they were concerned about chronic wasting disease, for example, the Andertons would not have a procedural or substantive due process claim there, because they have no property interest in the deer. They tried to claim that this expired deer permit somehow conveyed a constitutional property right, but that's simply not the case under Texas law. Also, with respect to the renewal, the Andertons claim that the district court got it wrong because they weren't actually convicted of a Lacey Act violation. They were only convicted of conspiracy to violate the Lacey Act. However, renewal of the breeder permit was discretionary, and one of the express conditions of renewal was that they comply with deer breeder regulations, and in their statement of fact supporting the plea, they admitted to three violations of deer breeder regulations, and therefore they have no legitimate claim to a renewal here and could not possibly have a property right in that. If the court has no further questions, I yield the remainder of my time. I ask that the court affirm. I do have one more question about the administrative inspection. How routine is it that officials go on to people's ranches to inspect or do whatever else you want to call it with deer? It's my understanding that it's a fairly regular practice, both to ensure that the records are kept properly, as well as to sort of inspect the conditions of the pen or the enclosures, as well as the number of deer on there, although that's not in the record and that's not in the pleadings. All right. Thank you. We'll hear the rebuttal. May it please the court, if I could first address some of the factual issues around this case. Your Honor, the deer largely in this matter were not used for hunting purposes. These deer are more similar to the, let's say, a Kentucky Derby winner or a prize bull where these deer are raised for the propagation of the herd and to increase the stock of the deer. In fact, one of the deer in this case, one of the male deer in this case, was valued at approximately $70,000. And definitely was over the value of any hunting value it may have had. It was used for insemination purposes and to increase the stock. For breeding. For breeding, yes. Yeah, but ranchers do that all the time. They want to get the good, well-bred deer so they can have bigger deer, so they can attract more people when they let people use the permits to kill, so they can get more money. I mean, but they're not, they don't go to the Deer Hall of Fame, they're out there to be shot. Ultimately, they may be slaughtered at some point for meat in whatever purpose, just like a cow, just like cattle are. At some point, they may, you know, that end may result for them. But the deer in this case weren't used for, you know, trophy hunting purposes in particular. The appellees in this case bring up the fact that, or allege that these deer were somehow diseased, or they also had chronic wasting disease, or there was a possible contamination of these deer. The instances that the Andertons were involved in, as far as the criminal conviction goes, were matters that related to 2005. The slaughter of these deer didn't occur until 2011 and 2012. Surely, at some point, some sort of symptoms would have arisen in the deer between that time that would have shown that they had chronic wasting disease. And as has been mentioned by the court, other cases involving similar situations where deer were either, had to be disposed of for the loss of a permit, often didn't result in the same circumstances that the Andertons endured. Sometimes, some procedures used by the department involved killing a small percentage of the herd to test them for the disease, and if they showed no signs of the disease, then they were disposed of in other ways, by selling them or by donating them to other deer facilities. Councilman, if we get away from the particular methods that were used to dispose, if we just go to the heart of, do they have a property interest? If they're wild and they're running free, they don't belong to anybody in Texas. If they're captive and you don't have a license to be able to have them captive or to breed them, you don't have a right to have them. So, it wouldn't seem to make a difference whether they were out in the field running or part of the breeding program if they don't have a permit. How do you get around, what is your best argument to get around the property interest decision made by the district court? Your Honor, the only case that starts to get into this issue is a bankruptcy court decision in the order of Texas that did find a property interest in the deer. They found a possessory interest in the deer breeder permit, and they found an expectancy interest in the profits derived from the deer. The Pelley's make no mention of this case and in no way attempt to refuse it. Was there an outstanding, pardon my ignorance of not being familiar with the case, but was there an outstanding permit in that case? Yes, there was a permit in that case. Okay, now here we don't have a permit, right? Well, the bankruptcy case took place several years after the permit was in existence. So, I'm not sure if the permit at the time of the bankruptcy case took place, but with regards to the permit, the androgens by state law were also not allowed to dispose of the deer because under state law, a deer breeder can't kill the deer. So, they couldn't kill the deer themselves, and also they could not transfer possession of the deer to somebody else because nobody else would take possession of them. I thought the statute says when you lose, when you don't get your permit renewed, you have to dispose of the deer. Yes, there's a conflict in the statute, and that's a lot of the reason why this has been a developing area and where the Texas legislature in 2013 saw the need to address this issue and impose due process into the statute. Thank you. All right, Counselor. Thank you. All the next case.